Laura TRIVISONNO, Plaintiff–
Appellant,

v.

METROPOLITAN LIFE INSURANCE
COMPANY, Steven C. Day, and Mark
J. Zumack, Defendants–Appellees.

No. 01–3213.

United States Court of Appeals,
Sixth Circuit.

June 24, 2002.

Before MARTIN, Chief Judge; KEITH and KENNEDY, Circuit Judges.

KENNEDY, Circuit Judge.

██ Plaintiff Laura Trivisonno sued her former employer, Metropolitan Life Insurance Company ("MetLife"), and two individual MetLife employees in Ohio state court alleging a violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, common law promissory estoppel, and common law fraud. MetLife removed the case to federal court and filed a motion to compel arbitration and stay the action. The district court referred the motion to a magistrate judge, who recommended that the motion be granted. Neither party objected to the magistrate's report and recommendation, and the district court entered an order staying the proceedings and compelling arbitration. After a hearing before the arbitration panel, the panel awarded Trivisonno the sum of $1600. The panel refused to award Trivisonno interest, punitive damages, or attorney's fees. The panel specifically declined to make a finding of fraud, but otherwise did not explain the basis for the award. Trivisonno then filed a motion in the district court to vacate the arbitration award. Defendants filed a cross-motion to confirm the award. On February 8, 2001, the district court entered an order denying Trivisonno's motion to vacate the award and granting the defendants' motion. Trivisonno appeals. For the reasons set forth below, we affirm.

## I. Factual Background

Trivisonno was employed by MetLife as an Account Representative for two different intervals. First, from 1988 to 1991, when she voluntarily left MetLife. Second, from April 1994 to October 1995, when she was terminated. This litigation involves her employment with MetLife during the second interval. In December 1993, Trivisonno began negotiating with Mark J. Zumack, a branch manager, to return to MetLife. According to Trivisonno, she agreed to return as an Account Representative in the Independence, Ohio branch office of MetLife at an Initial Payment Level (IPL) of $500 per week. An IPL is a fixed sum that is paid to representatives on a weekly basis, and is set according to the representative's sales production. Defendants maintain that during negotiations Trivisonno said "I'd like $500," to which Zumack replied that *"up to $500* seemed reasonable," depending on certain future circumstances. (Defs.' Brief at 10). When she started in April 1994, her IPL was only $400 per week. According to defendants, this amount was set based on the amount of sales Trivisonno completed during her Pre–Appointment Training (PAT) period. MetLife's policy is that the maximum IPL that can be paid to a new sales representative is equal to total production during the PAT period divided by three. Trivisonno's IPL was approximately equal to her total PAT production divided by five. Regional Manager Steven Day (Zumack's supervisor) testified that for his region, he adopted a policy requiring new sales representatives to produce five times their IPL during the PAT period. Zumack testified that Day's policy of "five times IPL" had been the practice in the region for as long as he could remember.

Following her PAT period, Trivisonno was appointed as a sales representative. She read and signed a document entitled "Appointment Checklist," which indicated that her IPL would be $400. She also signed a Uniform Application for Security

Industry Regulation, commonly known as a U–4 Form. The U–4 form contained the following provision:

I agree to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in item 10, as may be amended from time to time, and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction.

In Item 10 on the U–4 Form, Trivisonno indicated that she would register with the NASD, and thus the above provision required her to arbitrate any claims for which NASD rules required arbitration. The NASD Code requires the arbitration of "[a]ny dispute, claim, or controversy arising out of or in connection with the business of any member of [NASD], or arising out of the employment or termination of employment of associated person(s) with any member ...." (Code of Arbitration Procedure ¶ 3701, J.A. 37).

Once the PAT period is completed, the IPL is set, and the representative is appointed, MetLife requires the representative to "validate" during each of their first four quarters of employment. In order to validate, a representative must meet a minimum sales quota. If the representative fails to validate during any of the first four quarters, her employment is terminated, unless there are extenuating circumstances. Beginning with the fifth quarter, the sales quota is raised. At this point, if a representative fails to validate during a quarter, her compensation is reduced from the IPL to a weekly payment level (WPL). This amount is not fixed, and is calculated based on the amounts of production during previous quarters. If a representative fails to validate during two consecutive quarters, she is terminated unless there are extenuating circumstances.

Trivisonno began her second stint as a sales representative in April 1994. In September 1994, Trivisonno was diagnosed with endometriosis and was told that she would need a hysterectomy. Trivisonno testified that she told Zumack at that time that she would need to have the surgery done. According to Trivisonno, Zumack's response was: "Laura, could you please just hang in there for these four quarters? You have to validate your first four quarters in the business. If you don't, Steve Day will fire you." Zumack testified that he did not make this statement, and that he was not told of Trivisonno's need to have surgery until much later. Trivisonno continued working through her first four quarters, postponing the hysterectomy, and validated in each quarter. According to the defendants, she never requested a medical leave of absence or otherwise indicated that her medical condition left her unable to perform during these first four quarters. In her fifth quarter, Trivisonno failed to validate. It is clear from the record that Zumack knew Trivisonno was having health problems at that point. In a letter to Day, Zumack wrote: "Due to medical problems that Laura experienced in her fifth quarter she did not meet the production requirements to validate nor retain her IPL." Nevertheless, Zumack testified that Trivisonno never asked for medical leave nor told him that she needed surgery during the fifth quarter, and that he never threatened that taking such leave would result in her termination.

Following her failure to validate, Trivisonno's compensation was reduced from the $400 IPL to a $164 WPL, which was calculated with reference to her previous quarter's production. In June 1995, Trivisonno submitted to MetLife a medical statement from her healthcare provider

indicating that she would need surgery. She informed her supervisors that she would be undergoing surgery on July 7, and would be recovering until August 6. MetLife approved the leave, and paid Trivisonno her $164 WPL during her absence.

Around the time of her surgery, MetLife sent Trivisonno a letter indicating that she had not met her production requirement for the fifth quarter, and that if she failed to meet her requirement for the sixth quarter, she would be terminated. Trivisonno claims that this was an attempt to coerce her into not taking a leave of absence under FMLA. The defendants claim that this was a computer-generated letter that was left in her mailbox at the office. According to defendants, these computer-generated letters are automatically created and delivered after a representative fails to validate.

Trivisonno returned to work on August 7. The next day, Zumack contacted Day requesting that Trivisonno be given an extra four weeks to validate in the sixth quarter, to make up for the time lost for the surgery. Day denied the extension at that time, stating that the request was premature. Trivisonno would resume writing business, and at the end of the sixth quarter, in October, the extension would be granted if necessary. But Trivisonno never made it that far. Trivisonno was not writing much new business; she wrote only $300 during the sixth quarter. By mid-September she stopped showing up for work. In late September, she turned over her office keys to Zumack. She was terminated October 6, 1995 for failure to meet her production requirements. The issue of extending the time to validate was never revisited.

Trivisonno argues that the termination was pretextual. Aside from the threats of termination she claims to have received, she points to instances where MetLife re-duced the amount of business credited to her. The fact that certain commissions were pulled from Trivisonno is undisputed. MetLife, however, offers evidence of legitimate reasons for deciding to pull commissions from Trivisonno—namely, that some of the annuitants she signed had surrendered their policies. There is also some evidence that MetLife actually helped Trivisonno complete some sales while she was on leave. Zumack testified that he delivered a policy to Karl Kaiser, one of Trivisonno's clients, while Trivisonno was on leave. Trivisonno, however, has produced some evidence to refute that claim. As further evidence of pretext, Trivisonno points to another sales representative, Paul Wheaton, who failed to validate during his first few quarters of employment. Wheaton was not terminated by MetLife, but defendants claim that Wheaton would have been terminated, had he not quit before they had the chance to fire him.

Trivisonno also contends that, although she was dealing with serious medical problems, nobody at MetLife ever informed her of her rights under the Family and Medical Leave Act (FMLA) to take up to twelve weeks of unpaid leave without suffering any adverse consequences. She claims that the company failed to post any notices regarding the FMLA or information about filing a charge under the statute. Defendants presented some evidence to the contrary.

## II. Procedural Background

Trivisonno initiated these proceedings by filing suit in the Cuyahoga County, Ohio Court of Common Pleas. Her complaint alleged: 1) a violation of the FMLA, 2) a common law claim of promissory estoppel, and 3) a common law claim of fraud. Defendants removed the case to the United States District Court for the Northern District of Ohio, and filed a mo-

tion seeking to compel arbitration and to dismiss the case. The district judge referred the motion to compel arbitration to a magistrate judge, who recommended that the motion be granted. Trivisonno did not file an objection to the magistrate's recommendation, and the district court accordingly granted the motion and stayed the case. On November 11 and 12, 1998, the arbitration hearing took place before a panel of three NASD arbitrators. After setting forth a summary of the facts, the panel's award read as follows:

> After considering the pleadings, the testimony, and the evidence presented at the hearing, the undersigned arbitrators have decided in full and final resolution of the issues submitted for determination as follows:
>
> (1) That Respondents Metropolitan Life Insurance Company, Steven C. Day, and Mark J. Zumack are jointly and severally liable for and shall pay to Claimant Laura A. Trivisonno the sum of $1,600.00;
>
> (2) That Claimant's request for an award of interest and punitive damages is denied with prejudice;
>
> (3) That the panel has specifically declined to make a finding of fraud;
>
> (4) That other than forum fees which are specified below, the parties shall each bear their own costs, attorney fees and expenses incurred in this matter; and
>
> (5) That to the extent not specifically awarded or otherwise provided for above, all other claims and requests for relief by any party hereto are denied with prejudice.

Trivisonno sought to reinstate the case in the federal court. On June 22, 1999, the district court agreed to reinstate the case. Trivisonno filed a motion to vacate the arbitration award, and defendants filed a cross-motion to confirm the award. On February 8, 2001, the court entered a Memorandum of Opinion and Order denying Trivisonno's motion to vacate and granting defendants' motion to confirm the arbitration award. It is from this order that Trivisonno now appeals.

## III. Analysis

We review the district court's confirmation of the arbitration award for clear error on findings of fact and de novo on questions of law. *Dawahare v. Spencer*, 210 F.3d 666, 669 (6th Cir.2000). "It is well established that courts should play only a limited role in reviewing the decisions of arbitrators." *Id.* (quoting *Shelby County Health Care Corp. v. A.F.S.C.M.E., Local 1733*, 967 F.2d 1091, 1094 (6th Cir.1992)). A court may vacate an arbitration award only where: (1) the award was procured by fraud, (2) the arbitrators were evidently partial or corrupt, (3) the arbitrators misbehaved so that a party's rights were prejudiced, or (4) the arbitrators exceeded their powers or executed them so that a final, definite award was not made. *Id.* An award may also be vacated where the arbitrators have manifestly disregarded the law. *Id.*

Trivisonno argues that the award must be vacated for four reasons: (1) the district court should not have referred the matter to arbitration because claims under FMLA are not arbitrable, (2) the arbitrators manifestly disregarded the law, (3) the arbitrators so imperfectly executed their charge that they did not render a mutual, final, and definite award upon the matter, and (4) the arbitration hearing was tainted by false testimony. We address each of Trivisonno's arguments in turn.

### A. Arbitrability

Trivisonno's first argument is that claims under the FMLA are not arbitra-

ble because the FMLA guarantees the plaintiff's right to a jury trial. Without deciding that issue, we find that Trivisonno waived this argument by not objecting to the magistrate's recommendation. When the motion to compel arbitration was referred to the magistrate, Trivisonno opposed the motion. After the magistrate recommended that the district court compel arbitration, however, Trivisonno did not file an objection. A party who fails to object to a magistrate's recommendation waives subsequent review of the issue by the district court or the appellate court. *Miller v. Currie,* 50 F.3d 373, 380 (6th Cir.1995). To permit Trivisonno to raise this issue in this appeal would be an inefficient use of judicial resources, as the district court was not given an adequate opportunity to review the magistrate's recommendation.

### B. Manifest Disregard of the Law

■ Trivisonno next argues that the arbitrators demonstrated a manifest disregard of the applicable law. Trivisonno contends that the arbitrators' refusal to expressly find a violation of the FMLA represents manifest disregard for the Act. She points to her discharge and the letter warning her of her failure to meet production requirements as clear violations of the Act. But the facts surrounding these events were in dispute. MetLife's witnesses testified that Trivisonno would have received extra time to meet her sixth quarter production requirements if necessary, and that she was terminated only after she stopped showing up for work and had clearly given up on meeting her sixth quarter requirements. They further testified that the threatening letter was merely an automatically generated warning, and that they had explained to Trivisonno the possibility of extending her time to validate at the end of the quarter. The arbitrators were free to believe the testimony of the MetLife witnesses and find that there was no FMLA violation. Given our deferential standard of review, we cannot say that the arbitrators' refusal to find a FMLA violation was a manifest disregard of the law.

■ Trivisonno also contends that the arbitrators' failure to explain their reasoning constitutes a manifest disregard of the law. She cites a concurring opinion by (now Chief) Judge Martin in *Federated Dept. Stores, Inc. v. J.V.B. Industries, Inc.,* 894 F.2d 862, 871 (6th Cir.1990) (Martin, J., concurring). Judge Martin suggested that courts might reverse arbitration awards where there is no statement of the arbitrator's reason for making the award and where the record does not clearly indicate that the award was not based on a manifest disregard of the law. *Id.* at 871. Yet, Judge Martin's suggestion was not adopted by the panel in *Federated Dept. Stores,* nor any other subsequent panel of this court. *Dawahare,* 210 F.3d at 670. The Sixth Circuit has continued to hold that "[a]rbitrators are not required to explain their decisions." *Id.* at 669. That remains the law in this circuit, however desirable it might be, despite the recognition that should arbitrators choose not to explain their decisions it becomes "all but impossible to determine whether they acted with manifest disregard for the law." *Id.* at 669 (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jaros,* 70 F.3d 418, 421 (6th Cir.1995)). The form of the arbitrators' decision in this case is similar to that in *Dawahare*—an outline of the parties' contentions and evidence, followed by a monetary award simply designating the amounts, without explanation. Because we cannot find anything in the record to show that the arbitrators clearly chose not to follow applicable law, we will not vacate the award on the basis of the arbitrators' failure to explain their legal reasoning.

■ Finally, Trivisonno contends that the arbitrators' refusal to award attorney's fees was in manifest disregard of the law, because the FMLA provides reasonable attorney's fees to all prevailing parties. As Trivisonno implicitly recognizes, however, it is possible that the arbitrators' award was entirely based on the promissory estoppel claim, rather than the FMLA claim. If that were the case, the arbitrators would not be required to award Trivisonno reasonable attorney's fees.

## C. Indefinite Award

■ Trivisonno's third argument for vacating the award is that the award is too ambiguous. Trivisonno cites *United Steelworkers of America Local 4839 v. New Idea Farm Equip. Corp.*, 917 F.2d 964, 968 (6th Cir.1990) and *Cleveland Paper Handlers & Sheet Straighteners Union No. 11 v. E.W. Scripps Co.*, 681 F.2d 457, 460 (6th Cir.1982) (per curiam), among others, for the proposition that arbitration awards may be vacated when they are too ambiguous. It is true that where an award is unclear as to its effect and meaning, the court may remand the case to the arbitrator for clarification. *New Idea*, 917 F.2d at 968. But the crucial problem in cases like *New Idea, Cleveland Paper Handlers,* and the other cases cited by Trivisonno, is ambiguity in the award itself, not in the legal basis for the award. That is, courts are unsure exactly what it is that must be enforced. For instance, in *New Idea* the award directed that an employee "be made whole for straight-time earnings and benefits that would have been payable thereafter." *Id.* at 969. The court saw an ambiguity in that phrase. It could mean that the employee gets paid only his straight-time hours multiplied by his straight-time rate. Or, since the employee consistently worked overtime, it could mean that he also gets paid for the overtime hours he would have worked, but multiplied only by his straight-time rate. Hence, the court was unsure of the amount of payment that the award required.

Here, there is no such ambiguity in the award itself. The award indicates exactly how much money is owed Trivisonno, and who is liable for that amount. Because we find no ambiguity that prevents enforcement of the award, we refuse to vacate the award on grounds of ambiguity.

## D. False Testimony

Trivisonno's final argument in favor of vacating the award is that it was based on false testimony. She alleges four specific instances: (1) the testimony of MetLife employees indicating that they did not know that Trivisonno was ill and needed surgery until shortly before the scheduled operation, (2) the testimony of MetLife employees stating that Trivisonno received disability benefits during her medical leave, (3) the testimony of Zumack stating that he delivered a policy to Karl Kaiser, one of Trivisonno's clients, and (4) the testimony of MetLife employees that the standard production requirement was "five times IPL." Having reviewed the record, we find that none of these instances constituted fraud or perjury.

First, the MetLife employees testified only that they were unaware of Trivisonno's need for surgery, not that they were totally unaware of her condition. Although the letter from Zumack to Day indicated that Zumack knew of medical problems, it does not prove that Zumack knew she needed surgery. At the hearing, Zumack admitted that he knew of Trivisonno's medical problems in July. But he went on to testify that he was not told of her need for surgery until shortly before the surgery. There is no evidence, other than Trivisonno's testimony, that Zumack knew of her need for a surgery earlier. Hence, we cannot conclude that Zumack's testimony was false.

Trivisonno next claims that MetLife witnesses misled the arbitrators by testifying that she received disability benefits while she was on her four week medical leave of absence. It is undisputed that Trivisonno continued to be paid her WPL of $164 per week during her medical leave. Whether or not this is characterized as "disability" pay has no bearing on either the promissory estoppel issue or the FMLA issues. Further, Trivisonno does not cite to any testimony of a MetLife employee characterizing the pay as "disability" pay. Rather, Day stated that Trivisonno was on "paid leave" for four weeks, and received "[w]hatever her pay was" at the time.

With respect to the third statement, Trivisonno contends that Zumack lied when he testified that he, not Trivisonno, delivered an insurance policy to one of her clients, Karl Kaiser. Again, the materiality of this statement is questionable. Nonetheless, there is some evidence to corroborate Zumack's testimony. Although the contract itself bears Trivisonno's signature and Kaiser signed a statement indicating that it was Trivisonno, rather than Zumack, who delivered the policy, Kaiser nonetheless testified at the hearing that the policy was delivered to him by a man. Given this conflicting evidence, the record does not clearly establish that Zumack lied about delivering the policy.

Finally, Trivisonno challenges the testimony regarding the production standard of "five times IPL." Here, she argues that written evidence, specifically a Midamerica Territory PAT Checklist, instructed that for employee's with preferred LIMRA[1] scores, like Trivisonno, the production standard would be three times IPL or a total of five policies placed. Yet, Trivisonno does not provide the Midamerica Territory PAT Checklist in the appendix, and the testimony cited by Trivisonno only briefly describes this checklist. It is not clear whether the range indicated on the checklist was meant to be a minimum production requirement that could be increased at a regional manager's discretion, as Day testified, or a mandatory requirement applicable to all employees and not subject to Day's discretion. It is impossible to conclude from the evidence in the record that Day was lying about the way in which he calculated production requirements for sales representatives in his region, or about how he set Trivisonno's IPL.

IV. Conclusion

We must review arbitration awards deferentially. Trivisonno has not shown any valid reason for vacating the arbitrators' award in this case. We therefore affirm the judgment of the district court.

---

1. LIMRA is a test administered by MetLife to assess candidates' business aptitude.